Good morning, Your Honors. Jessica Warren for Appellant Plaintiff Nelson Roberts. May I please require I like to reserve three minutes? Thank you. It is well settled that the interactive process is a two-way street. Nelson Roberts' employers compounded their adverse effects of her disability rather than advocating for her, or assisting her, or engaging with her regarding alternatives to reasonably accommodate her disability. The trial court erred in granting TPMG San Marzulli judgment, where TPMG failed to engage meaningfully and in good faith in the interactive process. They denied outright Nelson Roberts' first request for nominate accommodation, did not call her doctor for clarification until after she stopped seeing that doctor. Letters sent inquiring that any change in her restrictions show that they were continuing to deny her doctor's recommendation. What was wrong with the denial of the initial request and accommodation that she not have any contact with her supervisor? How could the employer accommodate that request? Well, the case law does say that that's a problem, that the employer's not obligated to provide a new supervisor. However, what the problem is, is that they stopped there. So they said, all right, find your bargaining agreement. The precludes you from not betting on jobs that are based on seniority. And so the answer to your question is, the problem is not so much that they were refusing to give her a new supervisor or saying that they couldn't accommodate because of that collective bargaining agreement. The problem is that they stopped there. They never asked any further questions. TPMG made it Elsa Roberts' responsibility to suggest her own accommodation. They failed to suggest other options. They failed to offer other positions or even different hours. They continued to send Elsa Roberts letters regarding a different prescription  that was to be transferred out of the building. Elsa, may I ask you this? If they continued to send her letters regarding additional restrictions, why wasn't that PDA to using interactive pricing? Because when there were four letters, they were sent out repeatedly without change. And the other problem is that they weren't saying, we'll work with you. They were saying, what they're saying is that we absolutely cannot accommodate that restriction. She can come up with something else. So it's your position that it was the employer's obligation to come up with something else rather than the employee? It's a two-way street, Your Honor. So what did the employee do? The employee was out. She was depressed. She was confused. She was having difficulty concentrating. And she wasn't aware. She didn't have the special insight and knowledge that the employer had about the available positions and potential accommodations. So is it your position that the employee was excused from engaging in the interactive process, even though the employer was sending those letters, that the employee had no obligation to respond? The employee had an obligation to respond. But she did, at the end there, speak to Ms. Hyatt. And it became clear at some point that they weren't going to work with her on anything. There was no suggestion made. No, there were other hours available. The deposition testimony shows there were other shifts available. They didn't even approach her about perhaps working at a different startup or different student. So she's not excused from the interactive process, but she did what she could within her capabilities. Is it your position that the employer was just going through the motions? Yes, Your Honor. So didn't the employer reach out to Robert several times? So she failed to explain what the actual limitations were? Well, again, she was suffering from a major depression. She was having difficulty concentrating. She didn't say as much to the employer. So it's your position that she didn't really understand or know what her limitations would be at the job? Right, and that's something that they were invited to speak to her doctor. Dr. Hellman wrote a letter that invited the employers to speak to him if they had additional questions regarding the restriction. Well, the doctor didn't give any restrictions. He just said she isn't a supervisor without giving any restrictions, any limitations. He didn't say she's a thief. She's depressed. He just said she isn't a supervisor. So the doctor, I'm not sure that contacting the doctor would have been any good either because he was very sorry. Well, even if it wouldn't have done any good, he had a good day's obligation to at least attempt to speak to the doctor as to her condition. In the Seventh Circuit, they've stated that in cases where mental illness is the issue, that employers might have a slightly higher obligation in order to talk to experts, not necessarily the person who's suffering from it. The doctor didn't say she's depressed, she has no issues. She's emotional on the outscape. That's how you get that.  Right, Your Honor. But the trial court concluded that it's matter of law that that was engaging in the interactive process. What we're saying is that it deserves a trial for one of America's common issues. What is the issue of fact here? There are several issues of fact. And we have on excerpt of the record, page 615, Mr. Carretti refusing to accommodate Ms. Roberts without explanation. So we have on it. That's just a statement, but what is the issue of fact? The issue of fact is whether they reasonably, which is engaged in the interactive process with her. Well, where is the dispute? Isn't the record pretty clear as to what was written to the employer and what communications there were? Well, there are some disputes about whether my client knew that her supervisor had been transferred out on maternity leave. There are some disputes about whether my client ever said that she didn't want to engage in the interactive process. So there are a few factual issues here. Well, counsel, whether she wanted to engage or not, the record is clear about what letters were sent, what communications were made, what was the content of those communications. So why isn't that enough to determine the issue? Because reasonableness is typically a jury question. Well, counsel, didn't we deal with this very issue in Barnett versus U.S. Air? You're talking about the seniority issue? Well, I'm talking about in that case we ruled that an employee better understands her capabilities and limitation. So wouldn't you say that they would have an obligation to make sure the employer knows from the employee exactly what they can and cannot accomplish at work? I understand your point, Your Honor, but is it fair to lay that burden on somebody suffering from mental illness? Well, how does the employer know when they won't talk to the employer? Well, they have an invitation to speak to her doctor. But didn't Roberts, wouldn't she request it to provide some information? Those restrictions, which are something that her doctor would tell them or that they would give to get a doctor to know that, and the same restrictions were repeated throughout the record for a year. But didn't the doctor provide some very, very vague responses? Well, there's another factual excuse there for you. The Hellman situation is interesting because he's writing all these letters, and Kaiser makes a policy, changes their policy, that they don't want to permit long-standing positions for their workers' comp and disability claims any longer. He's gone that same day. Dr. Hellman leaves the same day Elsa Roberts' supervisor calls him to talk about her restrictions. Then he was already gone, and she's the disability manager. So she is differentially, she knew that he was no longer training her. Did she ever reach out to, no one ever reached out to Dr. Greenberg after she left? Did Dr. Greenberg ever reach out to anyone? I can't recall if Dr. Greenberg did. Well, he did write notes, he wrote doctor's notes that were provided. Yeah, but they were just saying, you know, she's off, she needs to be off for this additional period of time. Right, and there was some repetition in Greenberg's letters of the original restriction from Hellman's initial doctor's notes. I just, it seems to me that the employer, isn't it true that the employer repeatedly asked your client for her limitations, what her limitations were? They did, Your Honor. The letters, the letters are basically, there's been any change. So what they're saying is, if you're still claiming the same limitation, restriction, injury, disability, if you're still claiming the same thing, we're not going to work with you. And so the message in those letters that they sent was, unless you have something different to tell us about, then we're not going to accommodate you. What if the accommodation violated the collective bargaining agreement? That is, again, the other problem with this case is where the inquiry ends. We say that violates the collective bargaining agreement. It feels like they got legal advice that they didn't have to accommodate her and could use the collective bargaining agreement as sort of excuse. And the point being that she could have been thrown in positions that didn't even try to work with her to do that. And do we have a second time for rebuttal? Yes, please. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Good morning, Your Honor. Scott Redding, appearing on behalf of the Permanente Medical Group. And I intend to be fairly brief unless the panel has some questions, but I just wanted to highlight a couple. I think one of the key facts to show that there's no dispute that there was a failure or a breakdown in the interacting process here, and that was because of Ms. Roberts' complete lack of good vantage occasion in the process. Well, was it? Why didn't the company contact the doctors? If the doctors did, please feel free to ask any questions of me. Why didn't the company take advantage of the opportunity to contact the doctors to get more specific information? Well, I think the record reflects that there was one attempt to contact Dr. Hellman, and Dr. Hellman did indicate that he was no longer training her. So, no, even Dr. Hellman indicated he was no longer training. Why not contact the successor doctor? Well, again, I don't think there's an obligation on behalf of the employer to contact the doctor, but I think probably the most important fact is DKFG went out its way to actually draft a letter for Ms. Roberts to give to her doctors, explaining all the information they need, including the restrictions they were asking for, gave that letter to Ms. Roberts to give to her doctors, and there was no response to that whatsoever. Is it correct to say that the doctors were advising that it's to the time when she might be able to come back to work? That's all they were advising. Yeah, I think it went from giving this unreasonable restriction to no restrictions at all, just she can't work. And so the letters developed into, you know, just a situation where she can't work, and she can't work until that date, and then those letters would continue to come. And so even if the doctor said, please contact me if you have any questions, would it violate any – if the doctor said that, would it violate any laws or restrictions for the employer to call the employer and say what's the matter with this person? Well, I think – What are the problems? Yeah, I think that you have HIPAA issues, obviously. In fact, Ms. Roberts accused DPMG of violating HIPAA at one point when DPMG did contact a workers' compensation professional about her condition. So to suggest that they should have continued to contact her doctors after that I think is just unreasonable. The employer knew that the Y restriction that she had was that she had a new supervisor, and ultimately that supervisor was transferred out of the department. Is that point that the employer had an obligation to reconsider the restriction? Well, you raise a good point, Your Honor, because here's what happened. The record's clear that as of September 6th of 2012, Ms. Roberts was aware that Ms. Nunez had been transferred out. And what was – if you're looking for records of what happened next, DPMG got a letter from Ms. Roberts' doctors saying that she is completely disabled and she can no longer work. So – As of that point, is there a position then that the accommodation was no longer – would no longer be exempt? I think, Your Honor, in this case, we never in reality did see the accommodation issue because the interactive process completely broke down. The employer knew that that was the restriction she wanted, and instead had it be removed. And what was the employer's obligation at that point to reconsider that restriction? I think the employer would have reconsidered that restriction, but the employer instead received a letter from her doctors saying she can't work. Period. Period. And that's what the record reflects. And then shortly after that, Ms. Roberts said she didn't want to engage in the interactive process and that she's now permanently disabled. So there was really nowhere for the employer to go at that point. Unless the panel has any other questions. Thank you. I'm just curious about your response to the possible counsel's representation that by the time that the supervisor left the department, your client was permanently disabled and, therefore, the request and restriction would not have been effective. Well, at that point, that's absolutely correct. And they had a year prior to that in order to work with her and give her reason to think she was going to come back to work. And it didn't occur. And the Hartford case says that we have held the duty to accommodate as a continuing duty that is not exhausted by women. What I just don't understand is what were they supposed to accommodate to? Whose obligation is it to figure out what the disability is? Well, it's a two-way street. I think that case lists as a minimum. And I don't know if that's the issue. Well, but if she never tells them what they're to accommodate to, what does it imply to them? The problem is that there's kind of a false dichotomy between an accommodation and a restriction. They overlap in a way. And so restriction was that she couldn't be under stress. And second, it was inferable from the first doctor's note that stress was causing the issue, and that it was a mental health issue. I think it's inferable. I don't understand. She didn't supervise her family. Yeah. Right. But, again, it shouldn't have stopped there. It should have absolutely continued. And they had a year to work with her in that. Obviously, that a year is worth of time as well. Indeed. Was it distress from the potential HIV FC or new supervisor? It was. The PTSD started with the needle stick in 2009. And she had emotional issues all the way up until that meeting with Nunez, when the meeting with Nunez occurred. And it was. . . So you supposition that meeting put her over the edge because the employer was simply asking, why don't you come back to work? I would like to address that as well, Your Honor. The HIPAA issue with the workers' compensation, they had actually. . . Nunez had called her workers' comp provider to find out if she had an excused absence. It was not to seek any kind of accommodation whatsoever. It was to try to prove that she was having an excused absence from work or payment purposes was wrong to do that. Well, that's fine. But at the same time, I did obviate their obligation to continue with the interactive process. But the doctors, though, if you had the answer that they were invalidating, if the employer had an answer that they were invalidating, and provided a document in the notice directly, then why did Ms. Roberts get the information from the doctors and relay it to her employer? Well, again, I'll keep coming back to her mental state at that time. However, I would like to point out in Buckingham v. United States, I.D. F. Second 735, the court says that the applicant and qualified expert gathers sufficient information from the applicant and qualified experts as needed to determine what accommodations are necessary to enable the applicant to perform the job. So that says qualified experts as well. That would include her doctors. The case law is replete with references to people who actually could be directly contacted against one of these situations where you've sort of waived your medical privacy rights by putting them at issue. All right, counsel, thank you. Thank you. Thank you, then, counsel. The case is adjourned. Thank you. Thank you for your decision by the court. The next case on the order for argument is order in verse 3A.
judges: Schroeder, Rawlinson, Logan